IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**FERNANDO M. VELAZQUEZ-PEREZ**,<br>         Defendant. | Criminal No. 20-162 (ADC/BJM) |

## REPORT AND RECOMMENDATION

Fernando M. Velazquez-Perez ("Velazquez-Perez") is charged with one count of attempted coercion and enticement in violation of 18 U.S.C. § 2422(b). Docket No. ("Dkt.") 28. He moved to suppress statements made during an interview with the Federal Bureau of Investigation ("FBI"). Dkt. 62. The government opposed. Dkt. 66. The motion was referred to me for a suppression hearing and a report and recommendation. Dkts. 55, 63. I held a suppression hearing on October 19, 2023, Dkt. 76, at which the parties submitted exhibits. Dkts. 81, 82. Both parties filed simultaneous post-hearing briefs. Dkts. 84, 85. For the reasons below, Velazquez-Perez's motion should be **DENIED**.

### BACKGROUND

The following account of the facts is drawn from the testimonial and documentary evidence received at the hearing. The government presented as a witness FBI Special Agent Luis T. Rivera ("Agent Rivera"). Velazquez-Perez presented as a witness Dr. Deborah Perez-Mojica.

*The Online Investigation*

On March 6, 2020, Agent Rivera created a profile on a social media platform called Skout, posing as an eighteen-year-old female but made it known under the "About Me" section of the profile that "I'm not 18." Transcript of Record at 8-9, *United States v. Velazquez-Perez*, No. 20-cr-162 ("Transcript"); Dkt. 81-1 at 2. That day, Velazquez-Perez initiated a conversation with

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 2 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                                                2

Agent Rivera's female profile asking how old she was. Agent Rivera posing as the alleged victim responded that she was thirteen years old. Transcript at 10; Dkt. 81-2 at 2. They spoke through Skout for about thirty minutes before transitioning the conversation to the WhatsApp platform. *Id.* at 11. They kept talking for the next few days. The conversations ranged from talking about family and school interests. *Id.* at 11-12. Velazquez-Perez eventually asked the alleged victim if she had previously had sex and asked for some pictures. *Id.* at 12.

### *Velazquez-Perez's Arrest*

Velazquez-Diaz wanted to meet the thirteen-year-old girl in person and arranged to do so on March 9, 2020. Initially, Velazquez-Perez suggested meeting at a Bebo's Barbeque and meet in the parking lot. Transcript at 13. He also asked if her parents gave her permission to go out. *Id.* Eventually, they agreed to meet at Pueblo Supermarket. *Id.* Once Velazquez-Perez arrived at Pueblo, he was approached by FBI agents when he exited the vehicle and was arrested. *Id.*

### *Velazquez-Perez's Interview*

On March 9, 2020, Velazquez-Perez was taken to the FBI San Juan Field Office for questioning. There, he was interviewed by Agent Rivera and another agent. *Id.* at 13-14. Velazquez-Perez was interviewed in Spanish. Dkt. 81-3 at 3. At the beginning of the interview, Agent Rivera read to Velazquez-Perez his *Miranda* rights. After each right, Velazquez-Perez answered that he understood each right. *Id.* at 5-6. He also signed an Advice of Rights form but did not initial next to each right. Dkt. 81-4. Velazquez-Perez also signed three consent to search forms, which stated he agreed to have the agents search his vehicle, his phone, and his social media accounts. *Id.* at 9-11; Dkt. 81-5.

During the interview, Agent Rivera told Velazquez-Perez, various times, (1) he was being given the opportunity to clarify what his intentions were, s*ee* Dkt. 81-3 at 15, 29, 37; (2) he needed

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 3 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                                3

to tell his version and be honest, *see id.* at 29, 57, 62; (3) he needed to accept responsibility, *see id.* at 45-47; (4) he had to help himself out, *see id.* at 56; and (5) it would be liberating to tell the truth, *see id.* at 63. After about one hour of questioning, Velazquez-Perez admitted to communicating with soimeone he believed to be a thirteen-year-old girl for the purposes of engaging in sexual intercourse. *Id.* at 62-64. Agent Rivera also suggested writing a letter of apology to the thirteen-year-old girl, which Velazquez-Rivera wrote. *Id.* at 69, 71. The letter asked for the girl's forgiveness for "the stupid thing I was about to do" and told her to "forget about having sex with [an] adult." Dkt. 81-6. Agent Rivera stopped the interview for twelve minutes and then resumed the interview. Dkt. 81-3 at 71-72. Velazquez-Perez was reminded specifically of his right to remain silent and was reminded of the Advice of Right form he had signed. *Id.* at 72. He appeared to be calm throughout the interview. Transcript at 18-19, 21-23, 25.

### *Velazquez-Perez's Neuropsychological Evaluation*

Dr. Deborah Perez-Mojica examined Velazquez-Perez on October 22, 2021 to determine his level of cognitive and emotional functioning. Dkt. 82-1 at 1. He suffers from epilepsy, which is treated with prescribed medication. *Id.* at 2. However, he has not had a seizure event since 2015. *Id.* Dr. Perez-Mojica's report stated Velazquez-Perez showed a low average capacity in general intelligence, verbal comprehension and "brain functions associated to perceptual functions and perceptual reasoning." *Id.* at 7. Velazquez-Perez also showed "a moderately impaired verbal learning capacity together with a borderline short-term recall and mildly impaired long-term recall." *Id.* at 8. He had a learning disorder with impairment in comprehension and reading fluency. *Id.* Despite the report, Dr. Perez-Mojica testified that she explained to Velazquez-Perez what "limited confidentiality" meant and he understood the term. Dkt. 79 at 85. She also explained

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 4 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                                              4

that the evaluation did not constitute a doctor/clinician-patient relationship and Velazquez-Perez also understood its significance. *Id.* at 86.

## DISCUSSION

### A. *Miranda* Rights

The Supreme Court has held that a person subjected to "custodial interrogation" by law enforcement officers "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (internal quotation marks and citation omitted). An individual may knowingly, intelligently, and voluntarily waive these rights and answer questions without an attorney. *See id.* at 479. The government must demonstrate by a preponderance of the evidence that the required warnings have been given and that the defendant has waived them voluntarily, knowingly, and intelligently. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

"The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Miranda*, 384 U.S. at 476. *Miranda* warnings "are designed 'to protect against the extraordinary danger of compelled self-incrimination that is inherent in such situations.'" *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011). Therefore, it is not sufficient for the government to show merely that a law enforcement officer read a person his *Miranda* rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010). The government muse show that the person understands those rights and voluntarily and intelligently relinquishes them. *See id.* However, "[m]erely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement of the accused then admissible. *Miranda* requires the

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 5 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                5

interrogating officer to go further and make sure the accused, knowing his rights, voluntarily relinquishes them." *United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985).

The Supreme Court has explained that the inquiry as to whether *Miranda* rights have been waived "voluntarily, knowingly and intelligently . . . has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.*; *see also United States v. Carpetino*, 948 F.3d 10, 26 (1st Cir. 2020).

Whether *Miranda* rights have been knowingly and voluntarily waived "must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75 (internal quotations omitted). "Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal citations omitted). However, not one of these factors is dispositive. *See id.*

A waiver of *Miranda* rights is involuntary when it involves coercion by the government because "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state act has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 164. Therefore, "a defendant's mental state or condition, by itself and apart from its

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 6 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)    6

relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness . . . . Rather, the voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on free choice in any broader sense of the word." *United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006).

Velazquez-Perez moves to suppress the statements he made during the FBI interview. He contends his waiver was not knowing and intelligent because he did not understand his *Miranda* rights, he did not have the mental capacity to waive the *Miranda* rights, and his waiver was not voluntary because he was coerced. Dkt. 62 at 2-5. The government disagrees. Dkt. 66. I discuss each argument in turn.

### 1. Velazquez-Perez knowingly and intelligently waived his *Miranda* rights

First, Velazquez-Perez argues he did not understand his *Miranda* rights. I disagree. The government has established that Velazquez-Perez's waiver was knowing and intelligent. Agent Rivera read to Velazquez-Perez his *Miranda* rights in Spanish. Agent Rivera asked after each right, Velazquez-Perez answered that he understood the right. Transcript at 5-6. Additionally, Velazquez-Perez was given an Advice of Rights form in Spanish. Dkt. 81-4. He read out loud the last line of the form, which stated: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." *Id.*; Transcript at 5. Finally, Agent Perez told Velazquez-Perez that if he understood his rights, he should sign the form. Velazquez-Perez signed the form. Transcript at 5-6.

Next, Velazquez-Perez states even though he signed a written waiver of his *Miranda* rights, his waiver of his Fifth Amendment rights was not knowing and intelligent based on the evidence that he has a severe learning disability that leaves him with low intellectual functioning and an impaired ability to process. Dkt. 85 at 1.

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 7 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                                          7

I received expert witness testimony from the defense regarding Velazquez-Perez's mental capacity.  The evidence shows Velazquez-Perez's educational level is that of a third grader in Reading, Writing and Mathematics, and that he had no prior involvement with the criminal justice system.  However, I also heard testimony that Velazquez-Perez understood terms such as "limited confidentiality" and "doctor/clinician-patient relationship," which were explained to him during his psychological evaluation in Spanish.  Dkt. 82-1 at 8; Transcript at 85-86.  His understanding of said terms shows that Velazquez-Perez can comprehend complicated language.  Finally, Velazquez-Perez also knew why he was detained and that he had made a mistake by talking to the alleged victim.  When Agent Rivera asked Velazquez-Perez why the FBI had detained him, Velazquez-Perez answered "Um, I guess for talking, um, well, to a, well, minor." Dkt. 83-1 at 16; *see United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (finding that defendant with low IQ and no experience with criminal justice system understood what was happening when she waived her Fifth Amendment rights).

Viewing the totality of the circumstances particular to this case, I conclude that Velazquez-Perez's waiver was knowing and intelligent.

### 2. Velazquez-Perez voluntarily waived his *Miranda* rights

Velazquez-Perez argues that he did not voluntarily waive his *Miranda* rights because Agent Rivera repeatedly told him to tell the truth and that if he did so, Agent Rivera would talk to the prosecutor.  Dkt. 85 at 8.  While it is true that Agent Rivera told Velazquez-Perez to tell the truth multiple times, it is well established that "[n]either an admonition to tell the truth (even if repeated) nor a suggestion that cooperation would lead to favorable treatment is enough, without more, to constitute impermissible coercion." *Carpentino*, 948 F.3d at 28 (citations omitted).  In addition, the First Circuit has declined to find "a false assurance to a suspect that he was not in danger of

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 8 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                                8

prosecution" amounts to coercion. *United States v. Byram,* 145 F.3d 405, 408 (1st Cir.1998). Therefore, while Agent Rivera reiterated to Velazquez-Perez the importance of telling the truth, this does not amount to impermissible intimidation, coercion, or deception.

Additionally, Velazquez-Perez argues he was coerced into writing a letter of apology to the alleged victim. Dkt. 85 at 8. During the interview, Agent Rivera suggested that Velazquez-Perez write an apology letter to the alleged victim. Dkt. 81-3 at 69. However, Agent Rivera did so only after Velazquez-Perez stated he was "accepting [responsibility] because it was [his] mistake," *id.* at 52, and he had the intention of having sex with the alleged victim. *Id.* at 62-64. Suggesting to write a letter of apology seems to be a common tactic in a custodial interrogation. *See Montejo v. Louisiana*, 556 U.S. 778 (2009) (considering an inculpatory apology letter written during an interrogation); *see also United States v. Arroyo*, No. 19-CR-1506, 2019 WL 4601853, at *6 (W.D. Texas Sept. 23, 2019) (finding that defendant voluntarily wrote apology letter that FBI agent suggested defendant write). However, I must still look at the totality of the circumstances. Here, Velazquez-Perez agreed to write the letter. Dkt. 81-3 at 69. Upon this determination, Agent Rivera stated they were going to take a break in the interrogation so that Velazquez-Perez would have time to write the apology letter in his own words. *Id.* at 71. The break lasted twelve minutes. Velazquez-Perez never attempted to stop writing and completed the letter by the time the agents came back from the break. *Id.* at 72. As such, I find he voluntarily wrote the letter and was not coerced.

**B. Consent to Search**

Finally, Velazquez-Perez argues in his post-hearing brief that he did not voluntarily sign the consent to search forms for his vehicle, phone, and social media accounts. Dkt. 85 at 3-4. I should note, however, that Velazquez-Perez stated at the suppression hearing that the scope of the

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 9 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                                    9

hearing was solely the statements made during the interrogation. Transcript at 3-4.  Additionally, the government has not had an opportunity to address the argument. As such, I should defer judgment on this argument.  *See United States v. Knill*, No. 07-CR-0029, 2007 WL 1892560, at *5 (M.D. Pa. June 29, 2007).  However, in the interest of efficiency, I analyze the testimony Agent Rivera offered at the hearing. Based on that, I find Velazquez-Perez voluntarily signed the consent forms for the reasons explained below.

"A warrantless search violates the Fourth Amendment unless it comes within one of the 'few specifically established and well-delineated exceptions' to the warrant requirement. A consensual search is one such exception." *United States v. Forbes,* 181 F.3d 1, 5 (1st Cir.1999) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)).  In order to be valid, a person's consent to a search must be freely and voluntarily given.  *See United States v. Coraine,* 198 F.3d 306, 309 (1st Cir.1999).  The government has the burden of proving a valid, voluntary consent by a preponderance of the evidence.  *See United States v. Winston,* 444 F.3d 115, 121 (1st Cir.2006) (citing *Forbes,* 181 F.3d at 5).

Whether the government has established the voluntariness of a consent to search is a question of fact that turns on the totality of the circumstances.  *See Schneckloth,* 412 U.S. at 227; *see also United States v. Genao* 281 F.3d 305, 309 (1st Cir.2002).  This includes "both the characteristics of the accused and the details of the interrogation." *Schneckloth,* 412 U.S. at 226. In determining whether consent to a search is voluntary,

> [t]he court should take into account factors such as the consenting party's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.' Further considerations 'include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.'"

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 10 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM)                                   10

*Forbes,* 181 F.3d at 5. Consent is voluntary only if it is the product of an "essentially free and unconstrained choice," and not because a defendant's "will has been overborne and his capacity for self-determination critically impaired . . . ." *Schneckloth,* 412 U.S. at 225 (internal quotation marks and citation omitted). Moreover, "[s]ensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody." *United States v. Trueber,* 238 F.3d 79, 95 (1st Cir.2001) (internal quotation marks and citation omitted). However, custody alone "has never been enough in itself to demonstrate a coerced ... consent to search." *United States v. Watson,* 423 U.S. 411, 424 (1976); *see Forbes,* 181 F.3d at 6.

Here, Velazquez-Perez knew why he was detained by the FBI. Dkt. 83-1 at 16. When asked by Agent Rivera why did he think the FBI had detained him, Velazquez-Perez answered "Um, I guess for talking, um, well, to a, well, minor." *Id.* At the time he gave consent, he did not have handcuffs on. Agent Perez read to him the Consent to Search form, which informed him of his rights to refuse consent. Despite his low education level, Velazquez-Perez can understand complicated terms. Additionally, the atmosphere of the interview was calm, and Velazquez-Perez had just been informed of and stated he understood his *Miranda* rights. As such, I find that Velazquez-Perez voluntarily signed the consent to search forms.

## CONCLUSION

For the foregoing reasons, I recommend that Velazquez-Perez's motion to suppress be **DENIED.**

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See*

Case 3:20-cr-00162-ADC-BJM   Document 88   Filed 12/15/23   Page 11 of 11

*United States of America v. Fernando Velazquez-Perez*, Crim. No. 20-162 (ADC/BJM) 11

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30-31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 15th day of December, 2023.

<u>**S/ Bruce J. McGiverin**</u>
BRUCE J. McGIVERIN
United States Magistrate Judge